434 So.2d 496 (1983)
Clarles Albert LeBARON, Plaintiff/Appellee,
v.
LOUISIANA PACIFIC CORPORATION, Defendant/Appellant.
No. 15425-CA.
Court of Appeal of Louisiana, Second Circuit.
June 6, 1983.
*497 Tommy C. Rutledge, De Quincy, for defendant/appellant.
McKeithen, Wear & Burns by Russell A. Woodard, Columbia, for plaintiff/appellee.
Before HALL, SEXTON and NORRIS, JJ.
SEXTON, Judge.
Plaintiff brought suit for workers' compensation benefits, and the trial court awarded him total and permanent disability benefits, statutory penalties, and attorney's fees. We affirm.
Plaintiff-appellee in this cause is Charles Albert LeBaron, a 37 year old sawmill employee residing in Atlanta, Louisiana. Defendant-appellant is plaintiff's self-insured employer, Louisiana Pacific Corporation, a foreign corporation operating a sawmill in Urania, Louisiana.
Plaintiff began working for Louisiana Pacific in 1976. At the time of the injury alleged herein plaintiff operated a forklift at a "chip and saw mill" owned by Louisiana Pacific in Urania. Plaintiff's duties involved unloading log cores unsuitable for plywood milling off core trucks with a forklift, and the stacking of those cores at a plant site. The particular forklift utilized by Mr. LeBaron had originally been constructed with three steps between the ground and the cab to facilitate mounting and dismounting. However the step closest to the ground, which consisted of a single metal rung, had been accidentally bent back under the body of the forklift at such an angle that it could no longer be used. The second step, therefore, became the "bottom" step.
At 10:00 a.m. on approximately January 28, 1981, Charles LeBaron disembarked from this forklift by jumping some two and a half feet from the second step to the ground. Upon plaintiff's impact with the ground, he felt a sudden and debilitating twinge of pain in his back. As plaintiff described it
"When I jumped off of the lift my ... I... my back went out. A pain that I *498 never had in my whole life, it hit me. And I ... I didn't know what was wrong, I mean I've never been hurt and I thought I might just have knocked something out of place. So I went down with my back and I got up. And that put me in a slumped position. I mean, I was slumped over at that previous time because I couldn't straighten up."
Within an hour of his injury, plaintiff reported his injury to two of his work supervisors at Louisiana Pacific. However, Charles LeBaron continued to work until his shift ended at noon. Thereafter he went home complaining of pain received when he "jumped off the lift." Shortly after arriving home, he went to the nearby home of his father to perform some welding work on a woodsplitter his father was constructing. When the plaintiff attempted to rise from a squatting position he had assumed during this work, he could not get up, and required the assistance of two of his father's friends who were also helping in the project. Plaintiff reported severe pain at this point.
Upon his father's advice, the plaintiff donned a back brace of his father's and attempted to continue welding. However, he continued to suffer severe pain and had to quit.
He stayed in bed for four days thereafter, but returned to work on the fifth day for fear that he would lose his job because of expected employment curtailments at the mill. The plaintiff also testified that he hoped that the increased activity would cause his painful back condition to "wear off." He remained on the job until about February 12th when he was laid off because of a reduced demand for Louisiana Pacific's products. Plaintiff returned home and stayed in a reclining position for some four days until referred to Chiropractor Dr. Robert Ogg. Dr. Ogg treated the plaintiff for some five weeks until March 25, 1981. Plaintiff's back pain was somewhat relieved but he began to encounter pain in his left leg and hip which caused severe pain when he placed weight on his left foot. Due to these circumstances, Dr. Ogg recommended that plaintiff consult a medical doctor which plaintiff had avoided "because [he was] scared of a knife doctor." Plaintiff then consulted a physician at a Veterans' Hospital where his back condition was misdiagnosed as arthritis. He thereafter consulted his family physician, who after three visits was unable to diagnose his condition and referred him to an orthopedic surgeon, Dr. Daniel Kingsley of Alexandria.
Dr. Kingsley examined the plaintiff on April 8, 1981, and admitted him into the hospital on the next day for a myleogram performed on April 10. The plaintiff disregarded Dr. Kingsley's subsequent recommendation for immediate surgery because of his uncertain economic circumstances. However, the pain became unbearable and the plaintiff called Dr. Kingsley at home on April 27 and advised him that he had severe pain. Dr. Kingsley admitted him into the hospital on the following day and on April 29 performed disc surgery on the plaintiff, discharging him on May 4 and releasing him for work on June 1. The plaintiff indicated at that time that his previously immense back pain had been somewhat alleviated but felt that his back was "unstable." He also reported a "sciatic pain" from his left hip to his left foot.
Still feeling the effects of his injury, the plaintiff consulted Dr. Baer Rambach, an orthopedic surgeon, in Shreveport on August 20, 1981. Dr. Rambach advised him that he should not return to work and suggested that additional surgery might be necessary. On October 5, 1981, when next consulted, Dr. Rambach recommended that the plaintiff return to his original surgeon, Dr. Kingsley, and prescribed muscle relaxants and a week of bed rest.
Plaintiff's attorney sent a written demand for compensation benefits to Louisiana Pacific on April 10, 1981. Louisiana Pacific formally denied compensation benefits in a letter dated April 15. On May 13, plaintiff filed suit against Louisiana Pacific seeking total and permanent disability benefits, statutory penalties and attorney's fees. Plaintiff's claims were tried on November 10, 1981, and the trial court rendered *499 a judgment in plaintiff's favor on August 27, 1982.
The trial court decreed that defendant, Louisiana Pacific, pay plaintiff total and permanent disability benefits from January 26, 1981, until such time as it could be shown that plaintiff was able to return to work. These benefits were to be paid at the rate of $118.92 per week, which rate had been stipulated to by counsel of both sides as the legal rate of compensation. The trial court awarded plaintiff $4,691.90 in medical expense and $310.40 for travel expense incurred in obtaining medical attention. The trial court also awarded statutory penalties on all overdue medical expenses and compensation payments, and $2,000 in attorney's fees.
Although contesting this issue at the trial level, defendant-appellant Louisiana Pacific has expressly conceded, for purposes of this appeal, that plaintiff suffered a disabling injury within the course and scope of his employment. Thus, the two remaining issues framed by Louisiana Pacific's appeal concern the extent and duration of plaintiff's disability, and the propriety of the trial court's action in awarding statutory penalties and attorney's fees.
I. PLAINTIFF'S DISABILITY
Defendant-appellant contends, in Assignments of Error 1 and 2, that the trial court erred in classifying claimant's disability as total and permanent, rather than as total and temporary or partial. However, we conclude that the trial court did not err in finding plaintiff's disability to be total and permanent.
The initial severity of plaintiff's injury is attested to by the fact that when he first greeted his wife shortly after jumping from the lift and ending his work shift, he was holding his back and his pain was sufficiently visible that she immediately asked him what was wrong. The initial extent of plaintiff's injury is further made clear by the fact that when, later that same day he bent down to do some welding at his father's house, he was unable to get back to his feet unassisted. Plaintiff thereafter went to his own house where his wife's assistance was needed to get him into bed. Once in bed, he stayed there for four days straight.
The objective existence of plaintiff's excruciating disability was clearly illumined by the testimony of his treating surgeon, Dr. Kingsley. By the time plaintiff was treated by Dr. Kingsley, plaintiff's initial pain had metastasized from his lower spine and left thigh to his "left buttock and the left lower extremity, affecting all the toes equally." Furthermore, Dr. Kingsley testified, "There was also some numbness. He was unable to put weight on the left leg. He had a limp due to the pains. Pains awakened him even when he rested in bed." Dr. Kingsley discovered that plaintiff had "sciatica," all the way from the buttock to the calf. "In addition, the left ankle reflex was completely absent with no sensory change. Dr. Kingsley diagnosed plaintiff's problem as emanating from a spinal disc lesion. Dr. Kingsley felt, at that time, that plaintiff would risk permanent paralysis by engaging in manual labor and strongly recommended surgery.
Plaintiff originally avoided surgery because of his apprehension of the medical expense and because of his fear of "knife doctors." However, plaintiff suppressed these fears when he "couldn't bear the pain no more." As Dr. Kingsley testified, Mr. LeBaron
"called me sixteen days later ... and complained that the pains had suddenly become so much worse he simply could not stand them. And, he said to `go ahead and operate or do whatever you want. I can't stand it.' I put him in Cabrini Hospital on April 28th, and on May 1st I operated on his back."
Upon performing surgery, Dr. Kingsley was able to precisely pinpoint the cause of plaintiff's disability:
"There was a completely ruptured, very large [fifth lumbo-sacral] disc found what we would call a Grade A disc because I hardly had to do anything more than just pick it up once I made the opening."
*500 Louisiana Pacific, in contending that plaintiff was only totally and temporarily, or partially disabled, points to the testimony of Dr. Kingsley and Charles LeBaron as to plaintiff's post-surgical recovery, and to plaintiff's post-injury work activities.
Dr. Kingsley testified that plaintiff "made a spectacularly good recovery" and that "residual disability should be minor, if any." Furthermore, Dr. Kingsley released plaintiff to return to work on or about June 2. Plaintiff himself testified that Dr. Kingsley's surgery greatly alleviated the pain in his back, stating, "it was better, much better [after the operation]. I had to be better. I was about to die with the pain before." Observed plaintiff, "I didn't know a knife could do so much good." Plaintiff further testified at a deposition taken prior to trial that he felt that, subsequent to his surgery, he could perform the same work which he performed prior to his injury. However, plaintiff subsequently testified at trial that, after surgery, his back was unstable, he didn't feel he "could hold any kind of job," and he was sure that he could not perform all the manual functions previously required of him such as lifting log cores.
In contending that plaintiff is not permanently and totally disabled, Louisiana Pacific further points to the fact that plaintiff worked for them several days between the time of his injury and his termination. Moreover, plaintiff worked sporadically at odd jobs subsequent to his surgery. Plaintiff's odd jobs, in this regard, consisted principally of minor automotive tune-ups, lawn mower repairs, and one small painting job for which plaintiff received $125.
Although Louisiana Pacific's arguments are persuasive, they are not dispositive given the totality of the evidence adduced. The testimony of Dr. Rambach, who treated and examined plaintiff some five months after Dr. Kingsley performed surgery on him, represents a medical evaluation of plaintiff rendered closer in time to plaintiff's trial. Dr. Rambach's testimony was not inconsistent with Dr. Kingsley's testimony and constituted an important update and modification of Dr. Kingsley's testimony. Dr. Rambach's evaluation incorporated an analysis of the changes and trends in plaintiff's condition in the months subsequent to plaintiff's operation.
At the time of his first examination in August, Dr. Rambach observed that "the patient had not made at that time in my opinion a complete recovery from the surgery that he had had performed." He noted that plaintiff had "some restriction of motion of the lumbar spine," and that plaintiff's symptoms suggested nerve root irritation and scarring. Dr. Rambach's conclusion, with respect to his August 25 evaluation of plaintiff, was that plaintiff's symptoms merited further investigation. Dr. Rambach further concluded that:
"the patient had not made complete recovery from the injury and surgery that he had had to his lower back and that he wasn't able to return back to work at that time or at least the type of work that he told me he was doing and which I have already indicated, at least of my knowledge of what he was doing when he was hurt, working for the Louisiana Pacific."
Dr. Rambach subsequently examined plaintiff on October 5, 1981. Dr. Rambach summarized his findings on that occasion as follows:
"[Plaintiff] said he was doing better until a week before I saw him when he began having increasing pain and discomfort in his lower back after he mowed his yard at home. He said the pain got worse and then went into his left leg. It was difficult for him to sit for any extended period of time and even to put himself in a position which would give him relief from pain. And when he was telling me this story he honest to God looked like he was in a lot of pain. I mean he was bent over and he was grimacing. And unless he's the greatest actor in the world, I had no reason to doubt what he was saying."
Dr. Rambach recommended at that time that plaintiff "stay in bed for at least a week," and prescribed a muscle relaxant and a pain reliever for him.
*501 Dr. Rambach assigned plaintiff a "disability rating ... of 20 percent of the lumbosacral spine as applied to the body as a whole." Dr. Rambach based this disability upon the removal of plaintiff's ruptured spinal disc, plaintiff's restriction of motion, lack of reflex, his pain upon straight leg raising, and his observations of plaintiff's gait and carriage.
In translating plaintiff's physical condition into employment capability, Dr. Rambach stated that Mr. LeBaron "couldn't do the type of work that he was doing [previously]." Dr. Rambach "advised [plaintiff] that he was unable to work ..., at least I didn't think that he could." In the condition he was on October 5, 1981, Dr. Rambach affirmed, plaintiff could not perform any type of job or activity. Dr. Rambach stated, in further detail, that "on the findings of 10/5/81 I would be reluctant to let him drive a pulpwood truck for me .... because I think it could lead to ... further difficulty." Dr. Rambach stated that plaintiff would only be suited for jobs that did "not require prolonged standing, heavy lifting, repetitive bending, climbing or repetitive squatting or stooping, even prolonged sitting in a vehicle which would require long drives." In response to the question of whether he would medically approve plaintiff's status as a truck driver or mechanic, Dr. Rambach testified "absolutely not." According to Dr. Rambach, plaintiff was best suited, given his physical condition, "to do something of a sedentary or semi-sedentary nature." Added Dr. Rambach, "The best type of job would be work that he could go from a sitting to a standing position, maybe some bench work where he could stand from time to time, but not a night watchman." In Dr. Rambach's view, plaintiff could physically handle such a sedentary job "once he got over the episode I observed on 10/5/81."
Dr. Rambach verified that the recurrence of plaintiff's pain was totally consistent with plaintiff's back surgery. As Dr. Rambach explained, back surgery weakens the muscles involved and the nerve root that was originally compressed by the disc rupture becomes hypersensitive to pain and movement. Dr. Rambach further explained that it is not unusual for someone having back surgery done to initially make a good recovery and then experience problems as his activity increases and he augments the strain placed on his back. Dr. Rambach stated that plaintiff's problems emanated from the weakness of his back muscles and the compression of his nerve roots, that these nerve and muscle problems were commonly associated with disc rupture and surgery, and that plaintiff's symptoms were in no way inconsistent with the back surgery performed by Dr. Kingsley.
It should be noted that Dr. Kingsley testified that, even after surgery, plaintiff should avoid heavy lifting and that plaintiff would encounter pain if he worked an 8 hour shift at a job that involved squatting and stooping. Dr. Kingsley also alluded to the possibility that plaintiff's surgery could cause future problems since "there's a piece of his disc gone and what's left is bound not to be as functional as if he had the whole disc .... occasionally the whole space just collapses and then there's bone trouble, joint trouble, because the support of the disc is absent and the bone collapses and causes arthritis." Dr. Kingsley's prognosis that plaintiff would encounter little residual disability was also based on the fact that plaintiff had not called Dr. Kingsley subsequent to May 25, 1981, and Dr. Kingsley inferred from this fact that plaintiff was not encountering any substantial pain or disability. However, plaintiff clearly testified that he did not stop communicating with Dr. Kingsley because he was not feeling any pain, but because he was financially unable at that time to pay Dr. Kingsley for his services.
The totality of the medical evidence, and Dr. Rambach's in depth analysis of plaintiff's conditionwhich was based on two separate examinations of plaintiffsupport the trial court's finding of total and permanent disability. This finding is also supported by the testimony of plaintiff himself.
The fact that plaintiff worked sporadically subsequent to his injury does not *502 undermine the trial court's finding of permanent and total disability since this work did not reflect a curtailment of plaintiff's pain and disability. Plaintiff's disability continued throughout his sporadic attempts at work; plaintiff nevertheless continued to work out of sheer economic necessity. As Mr. LeBaron testified at trial, "I hurt every day I was there [at work after the injury]."; Mr. LeBaron nevertheless continued to work, as he further testified, "Because I have got a wife and two kids I have got to support and I had to hold my job."
Under LSA-R.S. 23:1221(2), a claimant is totally and permanently disabled if he is unable "to engage in any gainful occupation for wages." The total and permanent disability classification has been expanded by juridical interpretation to encompass those employees who, after injury, although capable of doing various odd jobs, may only perform work which is so limited in quality, dependability, or quantity that a reasonably stable and continuous market for that work does not exist. Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La. 1980). Furthermore,
"A common laborer is considered as totally and permanently disabled if the injury has substantially decreased his ability to compete with ablebodied workers in a flexible general labor market." Latin v. Hica Corp., 384 So.2d 479 (La.App.2d Cir. 1980), rev'd on other grds., 395 So.2d 690 (La.1981); Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985 (La.1976).
If a worker's pain appreciably limits the types of work available to him and greatly diminishes his ability to compete in the labor market, he may be treated as an "odd-lot" worker and therefore entitled to total disability benefits. Calogero v. City of New Orleans, 397 So.2d 1252 (La.1980). Also, a worker may fall within the "odd-lot" category and thus be found totally disabled even though he is able to periodically perform odd jobs. Southern Cotton Oil Co. v. Mitchell, 392 So.2d 695 (La.App.3d Cir. 1980).
In Southern Cotton, the court awarded total disability benefits, under the "odd-lot" doctrine, to a claimant who had little formal education, had spent all of his life doing manual labor, had no education or training for skilled occupations, and sustained an on-the-job back injury which prevented him from lifting weights over 50 pounds, from twisting or turning, and from sitting or standing for prolonged periods of time.
This plaintiff fits within the total disability classification because he cannot do manual work which requires lifting, or repetitive squatting, bending or stooping, or long periods of sitting. He is thus unable to do "heavy" manual or mechanical labor, or to drive trucks. He can engage in light mechanical repairs. However, it is our belief that a reasonably stable and continuous market does not exist for mechanics that cannot bend, or lift, or squat, or carry tools or parts, or sit for long periods of time. These are functions which normally inhere in, and are incidental to, a mechanic's job. Simply stated, there is no reasonably stable and continuous market for manual laborers and mechanics who cannot perform the strenuous tasks required of their profession. The applicability of this observation to this plaintiff is amply brought home by the fact that his post-surgery employment as a mechanic has been sporadic, and almost negligible, in spite of economic necessity.
Our conclusion that a reasonably stable and continuous market does not exist for this claimant is further corroborated by the fact that he is not suited for managerial or administrative positions. Claimant has had no formal education beyond high school, has never held a managerial post, and by his own trial admission has difficulty reading and writing. Thus, since plaintiff is not able to do either blue or white collar work for which a reasonably stable and continuous market exists, he is unable "to engage in any gainful occupation for wages" and is therefore totally disabled.
Furthermore, as the case law has made clear, a finding of total disability is not to be disturbed on the basis of sporadic work attempts made by claimant if such *503 claimant, as is the case here, encountered substantial pain in such attempts. Meche v. Gulf Coast Pre-Mix Trucking, Inc., 383 So.2d 77 (La.App.3d Cir.1980); Irby v. Edwards Rental & Fishing Tools, Inc., 380 So.2d 711 (La.App. 4th Cir.1980); Guidry v. Ford, Bacon & Davis Const. Corp., 376 So.2d 352 (La.App.3d Cir.1979). Nor is a finding of total disability to be disturbed on the basis of sporadic work efforts by an otherwise disabled employee where such efforts are inspired by the claimant's dire and necessitous financial circumstances. As the court stated in Serean v. Kaiser Aluminum & Chemical Corp., 277 So.2d 732, 735 (La. App. 4th Cir.1973), "oftentimes an employee will work in otherwise disabling pain for pressing economic reasons."
Louisiana Pacific has argued that the jurisprudence mandates that the testimony of treating physicians is to be preferred to that of examining physicians. It is true that the jurisprudence traditionally accords a deferential respect towards the opinion of treating physicians. St. Pe v. H.P. Foley Elec. Co., 341 So.2d 639 (La.App. 4th Cir.1977); Ridley v. Employers Commercial Union Co., 312 So.2d 126 (La.App. 1st Cir.1975); writ denied, 314 So.2d 736 (La.1975); Allen v. Early Co., 300 So.2d 518 (La.App.2d Cir.1974); writ denied, 302 So.2d 623 (La.1974). However, where, as here, the testimony of treating and examining physicians is only facially inconsistent, but when holistically considered is complementary and mutually supportive, a court need not ignore the testimony of an examining physician in deference to the testimony of a treating physician, but should consider the medical evidence as a whole.
It is clear, from the foregoing analysis, that the trial court did not err in finding the plaintiff totally disabled. A remaining question is whether plaintiff is temporarily or permanently disabled.
The medical testimony taken as a whole shows that plaintiff was disabled at the time of trial. However, Dr. Rambach, who examined Mr. LeBaron shortly before trial, was uncertain as to the duration of plaintiff's disability. Under circumstances such as these, where plaintiff is disabled at the time of trial and his disability is of indefinite duration, plaintiff's disability is properly classed as one of a permanent nature. Carruth v. Louisiana Motor Inns, 389 So.2d 99 (La.App. 4th Cir.1980); Schriner v. Riverside Companies, Inc., 378 So.2d 1035 (La.App.2d Cir.1979), writ denied, 380 So.2d 1368 (La.1980); Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985 (La.1976).
Plaintiff has expressed a strong willingness to return to work and the prognoses of Dr. Kingsley and Dr. Rambach suggest that Mr. LeBaron may well enjoy a substantial recovery. Thus, of course, Louisiana Pacific has a right, under LSA-R.S. 23:1331, to seek a modification of the trial court's judgment should plaintiff's condition continue to improve to the point that he is no longer disabled.
II. STATUTORY PENALTIES AND ATTORNEY'S FEES
The remaining issue is the correctness of the trial court's finding that Louisiana Pacific was arbitrary and capricious in denying benefits and was therefore liable for statutory penalties and attorney's fees.
It is well settled that an employer is liable for statutory penalties and attorney's fees under LSA-R.S. 23:1201.2 where it denies benefits absent a valid legal or factual basis for doing so. See Reed v. Lewing, 396 So.2d 1360 (La.App.2d Cir. 1981); Campbell v. Baker, Culpepper & Brunson, 382 So.2d 1046 (La.App.3d Cir. 1980), writ denied, 385 So.2d 793 (La.1980); Brewton v. L.L. Brewton Lumber Co., Inc., 349 So.2d 1364 (La.App.2d Cir.1977).
The plaintiff notified two of his immediate supervisors, Fred Davis and Hayward Hossler, that he had suffered an on-the-job injury the same day the injury occurred. Plaintiff spoke with Fred Davis again about his work-related injury several days later. Some two weeks after the accident, the pain in plaintiff's back had escalated to such a degree that plaintiff called Hayward Hossler over the telephone to inquire about obtaining medical attention. *504 Mr. Hossler directed plaintiff to speak with mill superintendent William Pharr the following day. Mr. LeBaron went to Louisiana Pacific's mill the following day as instructed and, accompanied by his wife, discussed his medical claims with Mr. Pharr. Mr. Pharr specifically asked plaintiff if his injury occurred on the job, and plaintiff unequivocally affirmed that the injury had indeed occurred on the job. Plaintiff asked Mr. Pharr if he could receive compensation benefits, and Mr. Pharr advised him that he should rely instead on unemployment benefits and his group insurance coverage.
Louisiana Pacific tried to establish at trial, through the testimony of supervisor Fred Davis, that plaintiff had told Davis that he, Mr. LeBaron, had originally hurt himself while helping his father construct the hydraulic woodsplitter. The trial court felt, however, that this version had been conclusively refuted at trial. Both of plaintiff's doctors, his wife, his father and three of his fellow employees all unequivocally testified that plaintiff had told them that his back had been injured in jumping from the forklift. Furthermore, plaintiff's wife testified that she first saw plaintiff in a painfully disabled condition after he returned home immediately after the end of his workshift on the day he jumped from the forklift. Plaintiff's father unequivocally testified that plaintiff did not injure his back while constructing the woodsplitter, but that he injured his back at work shortly before arriving to weld on the woodsplitter and was therefore unable from the outset to help construct the hydraulic device.
Plaintiff's testimony that he and his wife requested compensation coverage from William Pharr, mill superintendent, several weeks after the accident, was uncontroverted. The trial court apparently thought it was significant, as do we, that although William Pharr was present at trial, he was not called to the witness stand to refute the plaintiff's testimony in this regard.
It is thus clear, from an analysis of the evidence presented, that plaintiff repeatedly notified Louisiana Pacific's managerial personnel that he had suffered an on-the-job injury. Louisiana Pacific denied benefits in a letter stating that plaintiff had hurt himself while doing automotive repair work; however, there was not the barest scintilla of evidence adduced at trial to support this allegation. Louisiana Pacific neither commenced compensation benefits nor investigated plaintiff's claims in response to his persistent queries. They instead suggested that he rely on unemployment benefits and insurance coverage.
The trial court did not err in adjudging the claimant to be totally and permanently disabled, or in awarding statutory penalties and attorney's fees. The trial court's judgment is, therefore, in all respects affirmed.
AFFIRMED.