STEWART, Judge.
Plaintiff, Lemmie E. Johnson, filed this worker’s compensation suit against Fidelity & Casualty Insurance Company of New York. Johnson appeals the trial court’s judgment which dismissed his claims for underpayment of worker’s compensation benefits, and for attorney fees and penalties due to Johnson because of defendant’s arbitrary and capricious reduction and termination of benefits. We reverse and render.
FACTS
On September 14, 1981, all four fingers on Lemmie Johnson’s left hand were cut off as he cleaned a machine in the course of his employment with Mid-Continent Steel Casting Division of East Metals Corporation. His index and middle fingers could not be re-attached; his little finger and ring finger were fused, but are not functional for grasping. Fidelity & Casualty Insurance Company of New York (Fidelity) was the worker’s compensation (w.c.) insurer for Johnson’s employer. Fidelity paid benefits to Johnson in the following amounts: $148.00 per week from the date of injury until May 13, 1986; $58.40 per week from May 13, 1986 until July 24, 1990, when Fidelity terminated the payments.
On May 16, 1991, Johnson filed suit against Fidelity, seeking (1) total permanent disability benefits of $183.00 per week from September 14, 1981, with legal interest on all past due payments or portions thereof from the due date of each payment; (2) penalty interest of 12 to 36 percent on the total benefits owed to petitioner; and (3) penalty attorney fees of $15,000.00. Johnson requested penalties for Fidelity’s underpayment of benefits and for its arbitrary and capricious reduction and termination of benefits.
The trial court rendered judgment in favor of Fidelity and rejected Johnson’s demands. Johnson appeals.
TOTAL AND PERMANENT DISABILITY: ODD LOT DOCTRINE
Johnson contends that, under the odd lot doctrine, he is totally and permanently dis *654 abled as a result of his work-related injuries. We agree.
The statute applicable to a particular injured worker is the one in effect on the date of injury. Behmke v. K-Mart Corp., 581 So.2d 291, 295 (La.App. 5th Cir.1991). Because Johnson’s work-related accident occurred prior to the effective date of the 1983 amendments, the applicable law is the law prior to those amendments. See Houston v. Kaiser Aluminum and Chemical Corp., 531 So.2d 1129, 1132 (La.App. 4th Cir.1988).
At the time Johnson was injured, LSA-R.S. 23:1221(2) provided that a claimant is totally and permanently disabled if he is unable “to engage in any gainful occupation for wages.” The total and permanent disability classification was extended by judicial interpretation to include those employees who, after injury, although capable of doing various odd jobs, may be characterized as totally and permanently disabled under the “odd-lot doctrine”. See LeBaron v. Louisiana Pacific Corp., 434 So.2d 496, 502 (La.App. 2d Cir.1983), writ denied, 440 So.2d 758 (La.1983); Oster v. Wetzel Printing, Inc., 390 So.2d 1318, 1323 (La.1980). The Louisiana Supreme Court described total permanent disability under the odd lot doctrine in Lattin v. Hica Corp., 395 So.2d 690, 693 (La.1981) as follows:
Under the odd lot doctrine, a claimant is considered totally disabled if his injury makes him an odd lot in the labor market, that is, one capable of obtaining employment periodically but one whose services are so limited in quality, dependability or quantity that a reasonably stable market for his services does not exist. An odd lot claimant need not be absolutely helpless to qualify for total disability. If the claimant can prove that his physical condition, mental capacity, education, training age or other factors combine to place him at a substantial disadvantage in the competitive labor market, he has made out a prima facie case for classification in the odd lot category. This satisfies his burden of proving that he should be awarded benefits for permanent and total disability.
The determination of whether a claimant is entitled to total and permanent disability benefits under the odd lot doctrine is made after scrutiny of the evidence of the worker’s physical impairment as well as his mental capacity, education, and training. Turner v. American Mutual Insurance Co., 390 So.2d 1330 (La.1980). The language of the statute, “unable to engage in any gainful occupation for wages” is not synonymous with “unable to obtain employment.” Oster, supra, 390 So.2d 1318, 1323 (La.1980), citing 13 W.S. Malone and H.A. Johnson, Louisiana Civil Law Treatise, “Workers’ Compensation” § 276 at 625-626 (1989) and Johnson, Work of the Louisiana Appellate Courts 1977-78, 39 La.L.Rev. 881, 892-93 (1979).
The odd lot doctrine measures an employee’s disability in terms of loss of earning capacity and the availability of the type of work the employee is capable of performing. It is used only to determine whether an employee is permanently and totally disabled; the odd lot doctrine is inapplicable in determining whether an employee is entitled to compensation as a partially disabled worker. Cotten v. Union Tank Car Co., 434 So.2d 1219, 1221 (La.App. 1st Cir.1983), writ denied 440 So.2d 151 (La.1983).
Once the claimant presents a pri-ma facie case for permanent and total disability under the odd lot doctrine, the burden shifts to the employer or insurer to show that some form of gainful occupation is regularly and continuously available to the claimant within reasonable proximity to the claimant’s residence. Lattin, supra. If the worker establishes that he falls into the odd lot category, he is entitled to total, permanent disability compensation unless the employer or his insurer is able to show that some form of work is regularly and continuously available to the employee within reasonable proximity to the worker’s residence. Turner, supra.
We note that the trial court’s primary finding was that the 1983 amendment to 23:1221 was retroactive. Using the following language in its opinion, the trial court *655 alternatively found that Johnson failed to prove that he falls within the odd lot category (emphasis ours):
Even if this court were to rule that the amendment were not retroactive, Mr. Johnson does not fall within the outlines of the ■ “odd-lot doctrine”. Plaintiff in this instance does not meet the designated criteria established by the jurisprudence, and the evidence at trial establishes that there were a number of job descriptions which Mr. Johnson could have undertaken which were well within the limitations provided by his treating physician.
The trial court did not focus upon the question of whether Lemmie Johnson, considering both his physical and other limitations, can successfully obtain and hold regular employment in actual jobs available to him within reasonable proximity to his residence. See Turner, supra, 390 So.2d at 1333.
Johnson testified that he was born December 28, 1943 and had a 10th or 11th grade education. He said he can read and write and is right-handed. His previous jobs included work as a busboy, warehouse worker and/or stock department worker, chauffeur and yardman, driver for the elderly, and mechanic.
The June 2, 1983 report of Johnson’s treating physician, Dr. Marion Milstead, reads in pertinent part as follows:
At this time, the patient is explained that he may return to light type activities with his hand, but is told he will never be able to resume the type of employment that he had previously, working in construction type work and essentially is totally disabled from that type work due to the injury of his hand.
Total permanent partial disability is as follows at this time. On examination of Mr. Johnson’s hand, there is an 18% loss of the hand from the amputation of the index finger, 17% loss of the hand from amputation of the long finger with 5% loss of the hand due to the loss of PIP joint motion from the fusion, 8% loss motion of the long finger MP joint and 4% loss of motion of the small finger PIP joint. Adding to this a 10% loss of the hand from continued pain the patient has from a crushing injury resulting in arthritis, this gives a 62% loss of function of the hand on the left. This equals a 55.8% loss of the upper extremity and a 30.7% loss to the total body as a whole....
Thereafter, Johnson developed carpal tunnel syndrome in his left hand. Johnson testified that he could no longer do housework, yard work, or anything which involved use of his left hand. Friends/associates testified that he could no longer perform yard work for himself or for others. Although he did interview with some potential employers, none offered him a position. We find that Johnson presented a prima facie case for entitlement to permanent, total disability benefits as an odd lot employee. Thus, the burden shifted to Fidelity to show that employment opportunities were available to Johnson, within his capabilities and geographic area.
Fidelity presented lay witness testimony from George Polman. In 1986, Pol-man located various job openings and set up interviews for Johnson with the prospective employers. However, there was no evidence of job availability after that time. Likewise, there was no showing that any employer would hire a person in Johnson’s condition over healthy competitors. We glean from the record that Johnson is at a substantial disadvantage in such competition especially when all his prior jobs contained at least some required tasks which he can no longer perform. See Turner, supra, 390 So.2d at 1334.
Fidelity emphasizes the fact that Johnson can drive a car, but does not show occupations which involve only driving. Johnson’s testimony that he can operate automatic, but not standard shift, vehicles is uncontradicted. Even a courier must carry items and/or open doors while making delivery; taxi drivers often help with packages or luggage. Fidelity made no showing of regularly available employment within Johnson’s abilities.
In LeBaron, supra, 434 So.2d at 502, this court stated the following:
*656 Our conclusion that a reasonably stable and continuous market does not exist for this claimant is further corroborated by the fact that he is not suited for managerial or administrative positions. Claimant has had no formal education beyond high school, has never held a managerial post, and by his own trial admission has difficulty reading and writing. Thus, since plaintiff is not able to do either blue or white collar work for which a reasonably stable and continuous market exists, he is unable “to engage in any gainful occupation for wages” and is therefore totally disabled.
Although distinguishable with regard to Johnson’s ability to read and write, this reasoning is applicable in the instant case.
On the record before us, we find that Johnson presented a prima facie showing that he was unable to compete in the job market with healthy individuals and that Fidelity failed to show that some form of gainful employment is regularly and continuously available to Johnson within reasonable proximity to his residence. We conclude that (1) the trial court erred as a matter of law in its retroactive application of the 1983 amendment; (2) the trial court was clearly wrong in its factual finding that Johnson failed to show his eligibility, under the odd lot doctrine, for total permanent disability benefits. Under the pre-1983 amendment R.S. 23:1221, Johnson is entitled to total and permanent disability benefits based upon the amount he earned at the time of his injury. Accordingly, we now address the amount of w.c. benefits due to Johnson.
COMPUTATION OF COMPENSATION
Fidelity paid Johnson temporary total disability compensation at the rate of $148 weekly, then reduced its payments to $58.40 for permanent partial disability compensation. Gayle Guin, an insurance adjuster who handled determination and payment of Johnson’s w.c. benefits, testified that she received the “Employer’s First Report of Injury”, the initial report of Johnson's accident (trial Exhibit D-2) from his employer. That report provided, in part, the following information:
[[Image here]]
The signature on the initial report purported to be that of Jim Ward, Safety Director of Mid Continent Steel Plant # 1. Guin testified that she called the employer and verified the $5.54/hour, $221.60/week wage rate reported on D-2. The person who verified this figure was Jack Matthews. Matthews was her contact person with Mid Continent, and it was her understanding that Matthews handled worker’s compensation claims for Mid-Continent. Matthews did not testify. Guin further testified that the $148 paid to Johnson was two-thirds of the $221.60 which was reported on D-2 and verified by Matthews.
Johnson, on the other hand, testified that he earned $6.00 per hour at the time he was injured. Johnson asserts that he worked a lot of overtime hours, however neither party challenges the forty hour regular work week described on D-2. Therefore, the only information at issue from this report is the amount of hourly wages.
In 1981, the R.S. 23:1021 definition of “wages” read, in pertinent part, as follows:
(11) “Wages” means average weekly wage at the time of the accident. The *657 average weekly wage shall be determined as follows: (a) if the employee is paid on an hourly basis, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the injury or forty hours, whichever is greater;
There was no evidence as to the origin of the $5.54/hour, $221.60/week, figures contained in the employer’s first report of injury (D-2). Likewise, there was no indication that Matthews, or Ward, was in any way associated with either the personnel or payroll department such that he would have access to current wage information.
Neither Mid-Continent’s records nor Johnson’s pay stubs for this four week period were available for trial which took place more than ten years after the injury occurred. However, Johnson located one pay stub for the week ending 8/16/81, the week before the statutory four week period began. This was introduced into evidence as P-1 and is reproduced herein:
[[Image here]]
Assuming that Johnson was paid the “Reg. Pay” amount of $272.09 for his regular 40 hour work week, his hourly wage rate for the period ending August 16, 1981 was $6.80.
Johnson also introduced into evidence a computer printout (P-2) which reflected Johnson’s “year-to-date” gross earnings from June 1, 1981 through December 1, 1981. Witness, Dorothy Fain, had been an executive secretary for the president and vice president of East Metals. Mid-Continent was a division of East Metals. Fain testified that she obtained P-2 from the retirement files of East Metals. P-2 reveals that, between June 1 and December 31, 1981, Johnson was paid $4,274.74 for 729 hours.[1] This averages $5.86 per hour, or $234.55 per 40 hour week.
Johnson asserts that the trial court erroneously placed on him the burden of proving his pre-injury wages, rather than on the employer who is in a better position to prove its employee’s wages. Fidelity responds that, under Prim v. City of Shreveport, 297 So.2d 421 (La.1974), Johnson has the burden of proving each element of his claim. Although we do not quarrel with this proposition of law in general, we observe that it has been applied particularly to proof of the injury, accident, course and scope of employment, etc. We have been cited, and have found, no cases which hold that, where a claimant disputes the amount of his pre-injury wage, the employer has no responsibility — or has a lessened responsibility — to establish what the correct wages are.
The trial court resolved this issue by accepting the wages from the employer’s first report of injury. There was no finding with regard to who had the burden of proving the wage rate. Therefore, the question is whether the trial court correctly *658 determined the applicable wage rate, given the 10 years that had elapsed between the time Johnson was injured and the time he filed suit against Fidelity. The issue is not “who has the burden of proving the amount of Johnson’s pre-injury wages”.
At issue is the following: what evidence was the most probative evidence before the trial court from which it could determine the actual wages earned by Johnson at the time he was injured? Fidelity puts forth the report of first injury, which it admits is composed of secondarily obtained wage information, at best. On the other hand, Johnson puts forth a pay check stub which is from a week outside the statutory four week period.
Though the evidence presented on this issue is not optimal, we find that the trial court erred, as a matter of law, in its reliance on secondary information, the origin of which is unknown. It was error to accept these figures, without any evidence of a primary nature to indicate that the figures contained in the report were from the statutory four week period. Under these circumstances, use of the wage rate from this report is as arbitrary as use of the check stub figures.
Although the pay stub (P-1) was for the week preceding the 23:1021 statutory 4 week period, it is a document which originates from the employer and which supports Johnson’s contention that his hourly and weekly wage rate was more than that reported on the initial report (D-2). The hourly figure derived from P-2 closely approximates that which Johnson alleges was his actual pre-injury wage. Absent some compelling evidence to the contrary the trial court erred in this factual determination. The record contains no such compelling evidence.
We find that the best available evidence in the record is the computer printout. This printout, P-2, while still not the perfect piece of evidence, is more probative regarding the wage rate during the statutory period than either P-1 or D-2 for the following reasons: (1) P-2 involves a longer period of time from which to mathematically compute Johnson’s hourly wage, and (2) the P-2 figures encompass the statutory time period preceding the injury, whereas the paycheck stub is only for one week which precedes this period. See and compare, Hutchinson v. Livingston Wood Products, 562 So.2d 883, 887 (La.1990) (where plaintiff neither produced documentation nor subpoenaed employment records to support his wage allegation).
The record strongly militates against reliance upon the employer’s first report of injury, D-2, as the source for determining Johnson’s wages at the time of his injury. Under the unique circumstances of this case, specifically noting the absence of Mid-Continent’s records more than a decade after the work-related accident, we find that the computer printout is the best source for determining Johnson’s wage rate. We find that the trial court was clearly wrong in accepting the $5.54 per hour, $221.60 per week, figure as the proper amount from which to determine Johnson’s w.c. benefits because the evidence, as a whole, does not support this figure as Johnson’s wage rate.
We have already determined that Johnson is eligible for total and permanent disability compensation as an odd lot employee. Therefore, the reduction to permanent partial disability benefits of $58.40 was improper. Beginning with the date of his injury, Johnson is entitled to receive the difference between $156.27 (sixty-six and two-thirds of $234.55) and the amount he was paid.
STATUTORY PENALTIES
Johnson asserts that Fidelity is liable for penalties and attorney fees because it (1) used an inaccurate wage rate in its calculation of w.c. benefits, (2) reduced Johnson’s benefit payments on May 13, 1986, and (3) terminated payments on July 24, 1990.
Where there is a serious defense presented in good faith, the assessment of attorney fees and statutory penalties is not appropriate. Tucker v. Associated Grocers, Inc., 473 So.2d 328 (La.App. 1st Cir.1985), writ denied, 477 So.2d 716 (La.1985); Robichaux v. Terrebonne Par *659 ish School Board, 426 So.2d 241 (La.App. 1st Cir.1983). Whether or not a termination of or refusal to pay benefits is arbitrary, capricious, or without probable cause depends primarily on the facts known to the employer or insurer at the time. Scott v. Sears Roebuck & Co., 406 So.2d 701 (La.App. 2d Cir.1981).
Fidelity’s reliance on the wage figures on the employer’s first report of injury (D-2) was neither arbitrary nor capricious. Accordingly, Johnson is not entitled to penalties or attorney fees for the initial miscalculation of w.c. benefits.
In his June 2,1983 report, Dr. Marion Milstead described Johnson as “totally disabled from that type work due to the injury of his hand”. Dr. Milstead also used the language “total permanent partial disability” and assessed percentages of disability for Johnson’s fingers, hand, arm, and body. It was reasonable for Fidelity to interpret Dr. Milstead’s evaluation of Johnson as a diagnosis of permanent partial disability. On May 13, 1986, almost five years after Johnson’s injury, Fidelity reduced its w.c. payments to reflect partial permanent disability. At the end of 450 weeks, the maximum time that Johnson could have received w.c. benefits for permanent partial disability, Fidelity terminated w.c. payments. Although Fidelity miscalculated Johnson’s wage rate and erroneously concluded that Johnson was permanently partially disabled, we find no indication that Fidelity’s determinations or actions were either arbitrary or capricious.
Accordingly, we conclude that Fidelity is not liable to Johnson for penalties and/or attorney fees.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed at defendant’s cost. The judgment is amended to read as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, LEMMIE E. JOHNSON, and against defendant, FIDELITY & CASUALTY INSURANCE COMPANY OF NEW YORK, decreeing plaintiff to be totally and permanently disabled and awarding him worker’s compensation at the rate of $156.27 per week for the duration of his total and permanent disability. Each weekly payment is to be offset by the amount defendant has paid to plaintiff for that week. All sums awarded are to bear interest, from their respective due dates until paid, on the difference between the amount awarded and the amount already paid.
REVERSED AND RENDERED.
HIGHTOWER, J., concurs with written reasons.

. It is uncontested that Johnson did not return to work after his September 14, 1981 accident.